IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:14-CR-00001-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| JARVIS DEVAIL SESSOMS, ) | |
| ) | |
| Defendant. ) | |

This matter comes before the court on the motion by Defendant Jarvis Devail Sessoms ("Defendant") to suppress evidence seized by law enforcement officers and statements made by Defendant following a traffic stop on February 23, 2013. [DE-19]. The government filed a response in opposition to the motion [DE-20], and the undersigned held an evidentiary hearing on September 4, 2014, to further develop the record. Accordingly, this matter is ripe for review. For the reasons stated below, it is recommended that Defendant's motion to suppress be denied.

## I. PROCEDURAL BACKGROUND

On February 18, 2014, the Grand Jury charged Defendant by Indictment with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924. [DE-1]. At the suppression hearing, Defendant presented the testimony of Karen Houston Umstead ("Umstead"), an investigator for the Federal Public Defender's Office. Defendant also submitted four exhibits: a map of the location of the traffic stop (Def. Ex. 6), photographs of the location of the traffic stop (Def. Exs. 9, 10), and the narrative portion of the police incident report (Def. Ex. 13). The government presented the testimony of Special Agent Steven Norman ("Agent Norman")[1] who conducted the traffic stop and seized evidence at the scene on February 23, 2013, including the

---

[1] Agent Norman is now with the North Carolina State Bureau of Investigation, but at the time in question was a Deputy with the Chowan County Sheriff's Office.

firearm Defendant is charged with possessing. The government also submitted three exhibits: photographs of the intersection where Defendant made the left-hand turn preceding the traffic stop (Gov't Exs. 1, 2), and a Department of Corrections Offender Printout for Defendant (Gov't Ex. 3).

## II. STATEMENT OF THE FACTS

### A. Testimony of Agent Norman

Agent Norman was employed as a deputy of the Chowan County Sheriff's Department from 2009 to 2013, when he began working for the North Carolina State Bureau of Investigation. While with the Sheriff's Department, Agent Norman estimates that he performed over 1,000 traffic stops. Agent Norman testified about the gang presence in Chowan County and about his experience with gang activity, especially involving drugs and firearms. Agent Norman's experience with gang activity has been mostly practical–through debriefing and speaking with witnesses, for example. His familiarity with gang activity involving drugs and firearms comes through in-service training.

On the afternoon of February 23, 2013, Agent Norman was parked in a marked, unobscured patrol car in the median of Highway 17, four to five miles outside of Edenton. Agent Norman was observing traffic and looking for violations. The weather was clear, and it was not raining that afternoon. Between 2:30 and 2:45 p.m., Agent Norman noticed a gold Chevrolet Trailblazer pass his patrol car. The driver did not make eye contact with Agent Norman or acknowledge the presence of the patrol car, which Agent Norman testified is unusual in his experience. Agent Norman noticed that the driver had a rigid, stern posture and had his hat pulled low over his face. At that point, Agent Norman pulled out of the median and began following the Trailblazer. He also called in the Trailblazer's registration. Agent Norman followed the Trailblazer for about a mile, following the driver as he took the first marked exit off of Highway 17 (the North Broad Street Extended Exit). At the end of the exit ramp, the driver came to a complete stop at a stop sign.

2

Agent Norman indicated that the driver made a full stop, remaining at the stop sign for a few seconds longer than normal. The driver then made a left turn on North Broad Street, heading into Edenton. As the Trailblazer was making the left-hand turn, the passenger side of the vehicle crossed the white fog line which separates the lane from the shoulder of the road. Agent Norman's patrol car was stationary at the stop sign, and he had an unobstructed view of the Trailblazer making the left-hand turn and crossing the fog line. Agent Norman testified that the crossing of the fog line was a violation of North Carolina General Statute § 20-146(d)(1) for failing to maintain one's lane and that he had previously made traffic stops based on this violation.

Around the time of the Trailblazer making the left-hand turn, Agent Norman received a call about the car's registration. The Trailblazer was registered to Peggy Colson. Agent Norman recognized the last name Colson, having received reports from confidential informants on prior occasions about Peggy's son Lance. Lance was a white male, was 18 or 19 years old, and confidential informants had indicated that he was a street-level drug seller at the local high school. Agent Norman continued to follow the Trailblazer for one-eighth (1/8) to one-fourth (1/4) of a mile on North Broad Street before turning his blue lights on to pull over the vehicle.

After Agent Norman activated his blue lights, the Trailblazer turned right off of North Broad Street onto Davenport and then left into a driveway. Agent Norman exited his vehicle and approached the Trailblazer on the passenger side, seeing three men in the car. Agent Norman noted that the car was registered to Peggy Colson, but there was not a female in the car at that time. Lance Colson was in the back seat, and two black males were in the front seats. Agent Norman testified that he was familiar with the two men in the front and believed that they were involved in gang activities, but that he did not know their names at the time of the stop. Defendant was driving the car, and it was later determined that the front-seat passenger was Courtley Blount.

3

Specifically, Agent Norman was familiar with Defendant having seen him on Oakland Street in Edenton (known as "the Block"), a location known for gang activity. While on his regular patrols, Agent Norman had seen Defendant on the Block wearing gang colors, exhibiting gang behavior, and socializing with known gang members. As part of his job with the Chowan County Sheriff's Department, Agent Norman transported defendants from the jail to Chowan County District Court for hearings and other court appearances. Agent Norman also recognized Defendant as someone he had previously transported from jail to court, so he knew that Defendant had some kind of criminal record–although he did not know the details of that record at the time of the traffic stop. Agent Norman noted that he had not seen Defendant in the community for three to four months leading up to February 23, 2013. He did not know why Defendant had been absent from the community, but assumed that either Defendant had moved from the area or had been incarcerated. As for Courtley Blount, Agent Norman testified to seeing him on the Block. Agent Norman believed Blount to be a member of the Crips, as he had seen Blount wearing blue clothing and hanging around others wearing Crip colors.

After Agent Norman approached the Trailblazer, he informed Defendant that he had stopped the car for crossing the fog line during the left turn. Agent Norman then asked Defendant for his driver's license. Defendant responded that he did not have his license, which was another violation of North Carolina law, specifically North Carolina General Statute § 20-7(a). While speaking with Agent Norman, Defendant laughed nervously when told why he was stopped, and exhibited rapid, shallow breathing. Agent Norman asked Defendant to get out of the car so that he could identify Defendant. Defendant agreed and met Agent Norman at the rear of the vehicle. Defendant told Agent Norman that he was driving because the owner of the car (Lance Colson) was intoxicated. Agent Norman testified that he made the decision to ask Defendant to get out of the car because he

4

suspected further criminal activity beyond the traffic violation. Based on Agent Norman's training and experience, he frequently separates multiple occupants of a car in such situations. This helps prevent the occupants from concealing contraband or fleeing. Agent Norman had personally experienced someone fleeing a traffic stop on foot before the date in question.

Agent Norman asked Defendant to sit in the front passenger seat of his patrol car while Agent Norman verified his identification. Agent Norman testified that he does this so that he can control the situation. The close proximity makes it easier to observe the person's demeanor, and decreases both the likelihood that the person will lie directly to the officer or that the person will flee. When Agent Norman has someone sit in his patrol car, the person is not in handcuffs and his or her movement is not restrained. Agent Norman informed Defendant he was going to pat Defendant down for weapons before Defendant got into the patrol car. Agent Norman does not always pat down people he takes into his patrol car, but he testified that his knowledge of Defendant's involvement with the criminal justice system and Defendant's gang affiliation factored into his decision to pat Defendant down before taking him into the car.

After being told that Agent Norman was going to pat him down for weapons, Defendant produced a scalpel from his pants pocket, where it had been fully concealed. At this point, Agent Norman and Defendant were about a foot apart and facing one another. When Defendant produced the scalpel, Agent Norman became suspicious that there was more contraband to be found. From his training and experience, Agent Norman knew that before being searched, people will give an officer something to try and deter him from searching further. Because the scalpel was such a sharp weapon and because they were in close proximity (within lunging distance), Agent Norman also felt heightened concern for his safety. Agent Norman secured the scalpel in his pocket and then frisked Defendant for weapons, starting at the collarbone and moving downwards. When Agent Norman

5

reached Defendant's waistband, he felt something that he immediately recognized as the grip of a pistol at the midline of Defendant's stomach, tucked into the front waistband of Defendant's pants. Agent Norman grabbed the gun and told Defendant not to move, securing the gun in his back pocket. The gun was a nine-shot revolver and was loaded. There was one spent casing in the chamber and the other eight chambers were full. At that point, Defendant told Agent Norman that he had found the gun in Hertford and asked if he was going to jail. Agent Norman responded that he did not know whether Defendant was going to jail, in an attempt to diffuse the situation until police backup arrived. Three backup units arrived, and Agent Norman then confirmed that Defendant had a prior felony conviction. Defendant was originally charged with possession of a firearm by a convicted felon, and Agent Norman did not remember whether Defendant was charged with carrying a concealed weapon. Agent Norman estimated that less than five minutes elapsed from the time he had activated his blue lights to the seizure of the firearm.

On cross-examination, Agent Norman testified that the Trailblazer was not speeding initially, and no traffic violation had occurred when he began following the car. Agent Norman followed the Trailblazer from where he was stationed on Highway 17 to the top of the exit ramp–approximately 1.5 miles from where the patrol car was parked to the top of the exit ramp. Agent Norman stated that while the North Broad Street Extension Exit was the first state-maintained exit off of Highway 17 after he began following Defendant, there was also an available exit from the highway onto Shannon House Road. Defendant passed the turnoff for Shannon House Road after Agent Norman began following him, before taking the North Broad Street Exit. The Shannon House Road turnoff, however, is not a state-maintained, numbered exit off of the highway. Agent Norman admitted that Defendant did not take the first opportunity to leave Highway 17, but rather Defendant took the second opportunity. Agent Norman then acknowledged that the North Broad Street Exit is slightly

6

uphill because North Broad Street is an overpass over Highway 17, but denied that his car would have been below the Trailblazer while it was making the left-hand turn. Agent Norman stated however that the incline of the exit was very gradual, so if his patrol car was positioned below the Trailblazer during the left-hand turn, it would have been a few inches below the Trailblazer at most. Agent Norman also acknowledged that the fog line was on the opposite side of the road from where he was positioned in the patrol car at the stop sign. In response to questioning about state roadways being higher in the middle than on the shoulders, Agent Norman stated that he had no knowledge of whether that was true, and did not know specifically if North Broad Street is higher in the middle than on the shoulder.

Agent Norman then discussed the language of North Carolina General Statute § 20-146, "Drive on right side of highway; exceptions" acknowledging that subsection (d) was the subsection at issue here. This subsection provides additional rules for roads of at least two marked traffic lanes. Agent Norman acknowledged that nowhere in subsection (d), or anywhere else in the statute, is the phrase "fog line" used. Agent Norman testified that subsection (d)(1) states that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." N.C. Gen. Stat § 20-146(d)(1).

Agent Norman acknowledged that he received the information about the Trailblazer's registration from the communications center before he stopped the car. Agent Norman knew that the car was registered to a female, there was no report of the car being stolen, and no alert for law enforcement to be on the lookout for that particular car. Agent Norman did not see a female in the car. Agent Norman admitted noting the following before the stop: that Defendant's hat was pulled low, Defendant had a rigid posture, Defendant was black, Defendant was obeying the speed limit,

7

Defendant stopped completely at the stop sign, and the passenger side of the Trailblazer crossed the fog line one time. On cross-examination, Agent Norman testified he did not know either Defendant or Courtley Blount, but he recognized them. Agent Norman acknowledged that in his police report, he stated that he did not know anyone's name in the car, although at the hearing he testified on direct examination that he knew Lance Colson's name at the time of the traffic stop.

Agent Norman admitted that he had no direct knowledge of either Defendant or Courtley Blount having gang affiliations. As to Defendant, Agent Norman admitted that he had seen Defendant wearing red and hanging around validated Blood gang members. And as for Courtley Blount, Agent Norman admitted seeing him hang around gang members wearing blue, and believed him to be affiliated with a gang other than the Bloods. Agent Norman admitted that he believed Defendant and Courtley Blount were involved with two different gangs. Agent Norman further acknowledged that he had no formal training as to gang behavior, and that his knowledge came from his experiences on the job.

Agent Norman stated that the traffic stop had taken place almost 20 months prior to the hearing, and acknowledged that the police report (Def. Ex. 13) was written shortly after the stop. Agent Norman acknowledged that he did not mention in the report that he believed Defendant had recently been incarcerated, despite testifying on direct examination that he was not sure why Defendant had been absent from the community but assumed Defendant had been incarcerated or had moved. Agent Norman further admitted that his police report stated Defendant was apologetic when told why he had been pulled over, and did not include a description of Defendant breathing rapidly or laughing nervously. Agent Norman acknowledged that Defendant stopped immediately after the blue lights were activated, Defendant complied with his request to get out of the car, and Defendant went to the rear of the car to explain to Agent Norman why he was driving without a

8

license. Additionally, Agent Norman admitted that prior to patting down Defendant, he did not know what past crimes Defendant had committed and did not know for sure that Defendant had been incarcerated. Agent Norman stated however, that he knew Defendant had been in the sheriff's custody previously when he transported Defendant from jail to the Chowan County District Court. Agent Norman also admitted that Defendant would not have been free to leave after Agent Norman activated his blue lights and pulled over the Trailblazer.

On re-direct examination, Agent Norman stated that police reports are not a verbatim depiction of everything that happened and all of the officer's thoughts related to a particular incident. Agent Norman testified that the purpose of police reports are to refresh an officer's memory as to the underlying events and remind the officer of what happened, if he later has to testify.

### B. Testimony of Karen Umstead

As an investigator, Umstead routinely interviews clients and witnesses, reviews evidence, takes photographs, and puts together background evidence. In this case, Umstead conducted criminal history inquiries for Defendant and Courtley Blount and interviewed Lance Colson. Umstead testified that when she conducts a criminal history inquiry, she looks at three records: (1) Department of Motor Vehicles ("DMV") records, (2) Administrative Office of the Courts ("AOC") records, and (3) Department of Corrections ("DOC") records. Specifically, the DOC will designate individuals as gang-affiliated by noting that they are identified with a specific security threat group (a particular gang) on the DOC report for that individual. The DMV record reflects all of that individual's traffic stops, but will only indicate what the individual was formally charged with, not the reason that he or she was pulled over.

When Umstead ran the criminal history inquiry for Courtley Blount, his DOC record did not

9

Case 2:14-cr-00001-FL Document 29 Filed 10/21/14 Page 9 of 17

indicate any gang affiliation. Umstead noted that this meant the DOC had not designated Courtley Blount as being affiliated with a particular gang. As to Defendant's criminal history inquiry, Umstead noted that both the DMV and AOC reports showed an incident of driving while license revoked ("DWLR") on February 23, 2013. The AOC report also showed a charge of possession of a firearm by a felon from February 23, 2013 as well. Umstead stated that no report reflected that Defendant was charged with failing to drive on the right side of the highway from the incident on February 23, 2013.

Umstead testified that she visited the location where the stop occurred, beginning with the Thick Neck intersection on Highway17 and ending in the driveway off of Davenport Lane where the Trailblazer was pulled over. Umstead also testified as to her interview of Lance Colson, who spoke about his prior interactions with Agent Norman. Lance Colson described Agent Norman as being very crooked, and stopping people for no reason. Lance Colson also told Umstead that he had once been stopped by Agent Norman for not wearing a seatbelt, even though he was wearing one at the time.

On cross-examination, Umstead acknowledged that Defendant's DOC Report (Gov't. Ex. 3) identified Defendant as a United Blood Gang Member.

### III. DISCUSSION

Defendant has moved to suppress all statements made to law enforcement and physical evidence seized on February 23, 2013, on the grounds that the search and seizure violated the Fourth Amendment to the United States Constitution. Specifically, Defendant argues that Agent Norman lacked probable cause to stop Defendant's car and lacked reasonable suspicion that Defendant was armed and dangerous before subjecting him to a pat-down search.

The Fourth Amendment guarantees the right of the people to be secure against unreasonable

searches and seizures. U.S. Const. amend. IV. A traffic stop constitutes a seizure within the meaning of the Fourth Amendment, accordingly, in order to be reasonable a traffic stop must be supported by probable cause that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Further, "[t]o justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

### A.   Agent Norman had Probable Cause to Stop Defendant's Trailblazer

Defendant first argues that Agent Norman did not have probable cause to stop Defendant's Trailblazer, on the grounds that a single instance of leaving the lane of travel and crossing the fog line does not violate North Carolina law and thus does not provide probable cause for a traffic stop. The Fourth Circuit has held that "'[w]hen an officer observes a traffic offense–however minor–he has probable cause the stop the driver of the vehicle.'" *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (citing *United States v. Cummins*, 920 F.2d 498, 500-01 (8th Cir. 1990)). The North Carolina statute at issue here, N.C. Gen. Stat. § 20-146(d)(1), provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

In its discussion of the particular statute at issue here, the Fourth Circuit has stated that "pursuant to state and federal precedent, when a North Carolina patrol trooper observes a driver swerving out of his or her lane, the trooper has probable cause for a stop." *United States v. Flores*, 368 F. App'x 424, 430 (4th Cir. Mar. 5, 2010) (per curiam) (unpublished). In *Flores*, the Fourth Circuit determined that the defendant's "three readily observable traffic infractions" (crossing the fog line twice and the dotted center line once) supported probable cause for a traffic stop. *Id.* at 426,

11

430. The court in *Flores* referred to *United States v. Gallardo-Gonzalez*, noting that the Fourth Circuit in that case "concluded, with little difficulty, that a single incident of crossing over the fog line is a violation of [N.C. Gen. Stat. § 20-146(d)(1)]." *Id.* at 430; *see United States v. Gallardo-Gonzalez*, 331 F. App'x 255, 257 (4th Cir. May 22, 2009) (per curiam) (unpublished) ("Contrary to Gallardo-Gonzalez's contention, [§20-146(d)(1)] does not require that the driver be reckless in order for there to be probable cause to stop the vehicle. Rather, because Gallardo-Gonzalez's traffic violation was 'readily observable,' there was probable cause for the stop."). The stop in *Gallardo-Gonzalez* was based both on a violation related to the temporary vehicle tag and a single instance of the car crossing the fog line. *Gallardo-Gonzalez*, 331 F. App'x at 256.

Further, the North Carolina Court of Appeals has also held that a readily observable violation of state traffic laws constitutes probable cause for a traffic stop. In *State v. Osterhoudt*, the court held that the defendant violated N.C. Gen. Stat. § 20-146(d)(1) when he crossed the double yellow center line once while making a wide right-hand turn. — N.C. App.—, —, 731 S.E.2d 454, 460 (N.C. Ct. App. 2012). The court held that the officer's stop in *Osterhoudt* was reasonable, and not in violation of the Fourth Amendment. *Id.* at —, 731 S.E.2d at 462. Similarly, in *State v. Hudson* and *State v. Baublitz*, the court upheld as reasonable stops based on readily observable violations of N.C. Gen. Stat. § 20-146(a).[2] *State v. Hudson*, 206 N.C. App. 482, 484-86, 696 S.E.2d 577, 579-81 (N.C. Ct. App. 2010) (holding that there was probable cause to support a stop where the officer saw defendant "cross the center dividing line of the northbound lanes and weave back over the fog line two times"); *State v. Baublitz*, 172 N.C. App. 801, 807, 616 S.E.2d 615, 619 (N.C. Ct. App. 2005) (holding that the officer's "observation of defendant's vehicle twice crossing the center line

---

[2] N.C. Gen. Stat. § 20-146(a) states "[u]pon all highways of sufficient width a vehicle shall be driven upon the right half of the highway" and lists exceptions to this general rule.

12

furnished sufficient circumstances to provide . . . probable cause to stop defendant's vehicle").

Here, Agent Norman's patrol car was stationary at the stop sign and he had an unobstructed view of Defendant making the left-hand turn onto North Broad Street. The weather was clear that day, it was not raining, and the stop occurred in the middle of the afternoon during daylight hours. As Defendant made the left-hand turn, Agent Norman saw the passenger side of the Trailblazer cross the white fog line. Agent Norman followed the Trailblazer for a brief distance (one-fourth to one-eighth of a mile) and then stopped the car based on the "readily observable" violation of N.C. Gen. Stat. § 20-146(d)(1)–a violation for which Agent Norman had previously stopped other vehicles. Despite Defendant's contentions that this isolated incident of crossing the fog line once does not constitute a violation of North Carolina law to support probable cause for a traffic stop, as discussed in *Gallardo-Gonzalez*, N.C. Gen. Stat. § 20-146(d)(1) does not require reckless or repeated conduct.[3] 331 F. App'x. at 257. The inquiry is merely whether the traffic violation was readily observable, as was the violation in the instant case. Further, although Defendant at the hearing raised subjective factors that may have played into Agent Norman's decision to stop Defendant's car, the Fourth Amendment analysis focuses on objective reasonableness and not subjective intent. *See Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). As long as a traffic stop is supported by probable case, it is reasonable under the Fourth Amendment. *Id.* at 810. Because Agent Norman stopped Defendant's car based on a readily observable violation of N.C. Gen. Stat. § 20-146(d)(1), the stop was supported by probable cause

---

[3] Defendant cites to several cases for the proposition that a single incident of departing from the lane of travel does not constitute probable cause for a traffic stop. In addition to the Fourth Circuit and North Carolina case law that is directly on point, the case law cited by Defendant is non-binding, as is it from other jurisdictions, and unpersuasive, as the cases cited are factually distinguishable. *See, e.g., United States v. Gregory*, 79 F.3d 973, 978 (8th Cir. 1996) (holding that a single instance of a car leaving the lane of travel did not violate Utah law where "[t]he road was winding, the terrain mountainous and the weather condition was windy. Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity.").

13

and was thus reasonable under the Fourth Amendment.

**B.    Agent Norman had Reasonable Suspicion that Defendant was Armed and Dangerous**

Defendant next argues that Agent Norman lacked reasonable suspicion that Defendant was armed and dangerous before subjecting him to a pat-down, specifically that Defendant's failure to produce a driver's license and suspected gang affiliation did not constitute reasonable suspicion that Defendant was armed and dangerous. Generally, warrantless searches are "*per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citation and internal quotations omitted). "[B]efore an officer 'places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so.'" *United States v. Powell*, 666 F.3d 180, 185 (4th Cir. 2011) (quoting *Sibron v. New York*, 392 U.S. 40, 64 (1968)). A *Terry* frisk permits an officer to "conduct a carefully limited search of the outer clothing" of a person without a warrant when the officer has a reasonable suspicion that the person is armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 27, 30 (1968). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27. The Fourth Circuit has stated that "[j]udicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). This is an objective inquiry, and measures what an officer knew before conducting the pat-down. *Powell*, 666 F.3d at 186 (citations and quotations omitted). However, "it is entirely appropriate for courts to credit 'the practical experience of

14

officers'" and respect their "training and expertise," as actions that may appear entirely innocent in some contexts may signal the existence of criminal activity in others. *Branch*, 537 F.3d at 336-37 (quoting *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993)).

The Fourth Circuit has noted that "all roadside traffic encounters are potentially dangerous for law enforcement officers." *Powell*, 666 F.3d at 186 n.6. Even so, this "inherent potential danger is not enough, by itself, to justify a patdown." *Id.* The Fourth Circuit has consistently stated that knowledge of gang activity and prior criminal involvement are relevant factors to be considered in determining whether reasonable suspicion exists. *United States v. Johnson*, 475 F. App'x 19, 19-20 (4th Cir. Aug. 1, 2012) (per curiam) (unpublished) (considering both prior criminal activity and gang affiliation in determining whether reasonable suspicion existed); *Powell*, 666 F.3d at 188-89 (considering prior criminal activity and defendant's misrepresentations about having a valid driver's license); *United States v. Foster*, 634 F.3d 243, 246-47 (4th Cir. 2011) (considering prior criminal activity); *United States v. Holmes*, 376 F.3d 270, 277-78 (4th Cir. 2004) (considering the suspect's gang affiliation and past commission of violent crimes). The court has been clear, however, that prior criminal activity is not enough, standing alone, to justify reasonable suspicion. *Powell*, 666 F.3d at 188; *Foster*, 634 F.3d at 246-47.

Here, at the time Agent Norman made the decision to frisk Defendant before taking him into the patrol car, Agent Norman had previously seen Defendant associating with gang members in a high crime area, had transported Defendant from the county jail where he was being detained to hearings in state court, knew that Defendant had been absent from the community for some time, knew that Defendant did not have a valid driver's license with him, and observed Defendant

15

breathing rapidly and laughing nervously during their conversation.[4] Considering the totality of the circumstances, the undersigned determines that an objectively prudent officer in the same circumstances would have had reasonable suspicion that Defendant was armed and dangerous.

Further, this case is distinguishable from the Fourth Circuit decisions holding that an officer's mere awareness of a person's prior criminal activity does not constitute reasonable suspicion, as there are several other factors present here aside from Agent Norman's belief that Defendant was previously involved in criminal activity. *Cf. Powell*, 666 F.3d at 188 (holding there was no reasonable suspicion when the asserted grounds in support were knowledge of defendant's prior charges of armed robbery and defendant's misrepresentations about his driver's license); *Foster*, 634 F.3d at 246-47 (reversing the district court's denial of the motion to suppress where the articulated grounds for reasonable suspicion were knowledge of the defendant's criminal record and defendant's sudden and frenzied movements in the passenger seat of a parked car). Those factors include Defendant's nervous behavior, lack of a valid driver's license, and affiliation with gang members. Not only are there numerous factors in this case aside from Agent Norman's awareness of Defendant's prior criminal activity, the other factors are significant, particularly Defendant's association with known gang members. Accordingly, Agent Norman had reasonable suspicion that Defendant was armed and dangerous prior to subjecting him to the pat-down search.[5]

---

[4] At the hearing, Defendant challenged Agent Norman's testimony that Defendant was breathing rapidly and laughing nervously when Agent Norman asked him to get out of the car. Specifically, Defendant noted that these details were not contained in the narrative portion of Agent Norman's police report (Def. Ex. 13). Agent Norman testified that the police report is not an exhaustive narrative of everything that occurred, instead its purpose is to refresh an officer's memory of the underlying events as needed in the future. Having observed Agent Norman and assessing his demeanor on the witness stand and under direct and cross examination, the undersigned finds his testimony to be credible. *See United States v. Stevenson*, 396 F.3d 538, 542-43 (4th Cir. 2005) (noting that assessing the credibility of witnesses is the province of the district court).

[5] In making this determination, the undersigned does not consider the existence of the scalpel, as Agent Norman's testimony revealed that he had already decided to pat down Defendant before the scalpel was produced. *See Powell*, 666 F.3d at 186 (analyzing what the officer knew at the time he decided to conduct the pat-down search in determining

16

## IV. CONCLUSION

For the reasons set forth above, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation. Additionally, except upon grounds of plain error, failure to timely file written objections shall bar a party from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

SUBMITTED, the 21 day of October, 2014.

Robert B. Jones, Jr.
United States Magistrate Judge

---

whether reasonable suspicion existed).

17